UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN J. BAUMAN[1], | ) | CASE NO. 1:04-cv-1757 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| CITY OF CLEVELAND, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

On October 21, 2014, Magistrate Judge George J. Limbert submitted his Interim Report and Recommendation (Doc. No. 98 ["R&R"]) addressing the motion to show cause of third-party defendants, William Baumann ("W. Baumann") and Bradley Rd., Inc. ("Bradley"), and non-party Landsong Environmental Inc. ("Landsong") (collectively "movants") (Doc. No. 88 ["Show Cause Mot."]).[2] Movants maintain that defendants, City of Cleveland ("City of Cleveland" or the "City") and City Department of Public Health ("Health Department"), have violated a 2006 consent decree and should be held in contempt. The R&R recommends that the motion be denied. Following the grant of several requests by movants to extend the time for filing objections, movants filed

---

[1] As noted in the R&R, the surname "Baumann" is misspelled on the docket. (*See* Doc. No. 1-1 ["St. Ct. Compl."].) The Clerk is directed to correct the docket to reflect the proper spelling.

[2] This case was originally assigned to the late Hon. John M. Manos. On July 11, 2006, it was reassigned to the Hon. Peter C. Economus, and it was ultimately reassigned to the undersigned on April 15, 2014. Magistrate Judge George Limbert was assigned to serve as the designated magistrate judge, pursuant to L.R. 3.1, on July 11, 2006.

objections to the R&R. (Doc. No. 101 ["Obj."].) Defendants have filed a timely response. (Doc. No. 102 ["Resp."].)

Upon *de novo* review of those portions of the R&R to which movants have made objection, the Court overrules movants' objections and denies the motion to show cause.

I. **BACKGROUND**

Because movants objected only to the portion of the R&R recommending the denial of the contempt motion, the remainder of the R&R—including its thorough account of the factual and procedural history of the case—is hereby accepted as written. (*See* R&R at 906-919.)[3] Nonetheless, to understand how the movants and defendants arrived at this juncture, it is necessary to go back more than a decade to the genesis of the underlying dispute and briefly review the more salient details.

The story begins with Bradley's efforts to operate a landfill (referred to herein as the "Landfill") on a parcel of land owned by plaintiff Brian Baumann ("B. Baumann"). When Bradley's construction and demolition debris ("C&DD") license was revoked by the City of Cleveland in 2003, B. Baumann entered into a business venture with his brother, W. Baumann, to reinstate the Landfill as an operating concern. Following faltering licensing negotiations with defendants, B. Baumann brought suit in state court. By his August 30, 2014 complaint, B. Baumann attempted to block defendants' efforts to collect the $250,000.00 letter of credit B. Baumann offered to

---

[3] All page numbers are to the page identification number generated by the Court's electronic docketing system.

support the reopening of the Landfill. He raised claims for unconstitutional taking, unjust enrichment, conversion, statutory theft, and fraud. He sought monetary damages and a declaration that defendants were not entitled to the funds supporting the letter of credit. (Doc. No. 1-1 ["St. Ct. Compl."] at 9-18.) The action was removed to federal court on August 30, 2004. (Doc. No. 1 ["Not. of Rem."].) The City filed a counterclaim against B. Baumann and Bradley, and filed a third-party complaint against W. Baumann and various other entities. (Doc. No. 4 ["Ans. & CC"]; Doc. No. 7 ["Th. Pty. Compl."].)

On July 13, 2006, the Court, upon the agreement of the parties, entered a consent decree. (Doc. No. 61 ["2006 Consent Decree" or the "Consent Decree"].) The Consent Decree provided that the 2003 C&DD license was to be reinstated, and that the annual renewal licenses for 2004-2006 were to be issued for the Landfill. (*Id*. at 282.) With respect solely to the 2006 C&DD license, it was to be modified to designate Edgerton Holdings LLC ("Edgerton") as the Landfill operator, and it was further modified to require Edgerton to post the necessary financial assurances and correct existing violations, including those explicitly identified in the Consent Decree. (*Id*. at 282-284.) As part of the supporting settlement agreement, the funds securing B. Baumann's letter of credit were to be returned to him. (Doc. No. 76-2 ["2006 Settlement Agreement"] at 415.) Neither the 2006 Consent Decree, nor the 2006 Settlement Agreement provided for licensing after 2006.

In accordance with the Consent Decree, defendants caused the C&DD licenses to retroactively issue for the years 2003-2006. However, movants concede that almost immediately thereafter, issues arose between W. Baumann and Edgerton. (Obj. at

3

593.) On October 6, 2006, the City of Cleveland filed a motion to show cause against W. Baumann, Bradley, and other entities accusing them of wrongfully ejecting Edgerton from the property and interfering with Edgerton's efforts to correct the violations, enumerated in the Consent Decree, at the Landfill. (Doc. No. 62.) After a hearing on the motion, the Court entered an order finding W. Baumann, Bradley and the other entities in contempt and enjoined these parties from further interference. (Doc. No. 68 ["Nov. 16, 2006 Order of Contempt"].) The City sought a second order of contempt against these same parties. (Doc. No. 78.)Although no ruling appears to have ever issued on this subsequent show cause motion, the docket indicates that a show cause hearing was scheduled to address it. (*See* Doc. No. 81 and Minute entry dated July 24, 2007.)

The relationship between W. Baumann and Bradley on the one side, and Edgerton on the other continued to sour. On November 16, 2007, W. Baumann, Bradley and others filed a motion to clarify the Consent Decree to replace Edgerton with another entity, Kurtz Bros. (Doc. No. 83 ["Mot. to Clarify"] at 500.) On December 12, 2007, the Court denied the motion. W. Baumann and Bradley also became embroiled with Edgerton in two state court actions involving the Landfill. (Doc. No. 91-4 [docket in *Edgerton Holdings LLC, et al., vs. Bradley Road Inc., et al.*, Cuyahoga County Court of Common Pleas Case No. cv-06-603496]; Doc. No. 91-5 [docket in *Edgerton Holdings, LLC, et al., vs. Bradley Road, Inc., et al.*, Cuyahoga County Court of Common Pleas Case No. cv-11-757167].) By the time the latter of these lawsuits was filed, W. Baumann and Bradley had joined forces with Landsong, a company that was interested in conducting surface mining at the Landfill and was W. Baumann's latest choice to replace

4

Edgerton as operator. (*See* Show Cause Mot. at 595-96.) The first of these state court actions, referred to in the present briefing as "*Edgerton 1*," resulted in a 2010 settlement that provided, in part, that Landsong would be the facility's operator going forward. (Doc. No. 88-1 [*Edgerton 1* Settlement Agreement] beginning at 653.) The second action, referred to in the present briefing as *Edgerton II*, also resulted in a settlement. (*Edgerton II* docket.) The City was not a party to either action.

On April 7, 2014, movants filed the present show cause motion. Relying on the 2006 Consent Decree, movants complain that the City of Cleveland has refused to issue renewal licenses for the Landfill for the years 2010, 2011, 2012, and 2013. (Show Cause Mot. at 595.) In support of the motion, movants cite notices of violations issued in 2010 and 2012 by the City of Cleveland, as well as the City's December 2013 resolution opposing future licensing of the Landfill on the ground that the unabated environmental hazards existing on the property had rendered it unsafe and unusable as a C&DD landfill. (*Id*. at 601-02.) Movants also highlight the City's recent decision to withdraw its support for surface mining at the Landfill. (*Id*. at 610.) By refusing to support the issuance of a current C&DD license to Landsong, movants insist that defendants are frustrating Landsong's efforts to remediate the violations existing at the Landfill and identified in the 2006 Consent Decree.

In the R&R, the Magistrate Judge recommended that the Court deny the show cause motion because movants' complaints fell outside the four corners of the 2006 Consent Decree. Noting that the Consent Decree only addressed licensing at the Landfill for the years 2003, 2004, 2005 and 2006, the Magistrate Judge determined that the City's

recent actions could not support a violation. Moreover, the Magistrate Judge concluded that the "[t]he facts that other lawsuits have emanated about the operator of [t]he Landfill and other issues have arisen concerning the ability of Landsong to come into compliance with licensing requirements has no bearing upon the requirements of Cleveland or W. Baumann and Bradley dictated by the [Consent Decree]." (R&R at 925.)

## II. STANDARD OF REVIEW

### A. *Magistrate Judges Act and Objections to a Magistrate's Report*

"Any report and recommendation by a magistrate judge that is dispositive of a claim or defense of a party shall be subject to de novo review by the district court in light of specific objections filed by any party." *Powell v. United States*, No. 94-5441, 37 F.3d 1499 (Table), 1994 WL 532926, at *1 (6th Cir. Sept. 30, 1994) (citing, among authorities, 28 U.S.C. § 636(b)(1)). "An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004); *see also* Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to."); LR 72.3(b) (any objecting party shall file "written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections"). After review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

B.  *The Court's Authority to Enforce its Orders and Decrees*

The purpose of a contempt proceeding is to "enforce the message that court orders and judgments are to be taken seriously." *Elec. Workers Pension Trust Fund of Local Union #58 v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 385 (6th Cir. 2003) (citing *N.L.R.B. v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 590 (6th Cir. 1987)). A complaining party in a contempt proceeding must prove by clear and convincing evidence that the alleged contemnor violated "a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Cincinnati Bronze*, 829 F.2d at 591 (quotation marks and citation omitted).

Consent decrees are orders issued by a court, and, as such, a court has a "duty to enforce . . . [its] consent decrees as required by circumstance." *Shy v. Navistar Intern. Corp.*, 701 F.3d 523, 532 (6th Cir. 2012) (quotation marks and citations omitted); *Waste Mgmt. of Ohio v. City of Dayton*, 132 F.3d 1142, 1145 (6th Cir. 1997) (A federal court is required to "protect the integrity of [its consent decrees] with its contempt powers[.]"). When ruling on a motion to show cause why a party should not be held in contempt of a court's consent decree, the interpretation of the consent decree is a question of law for the court. *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995) (further citation omitted).

7

### III. OBJECTIONS TO THE R&R

#### A. *Non-Party Landsong Lacks Standing to Object*

While Landsong readily concedes that it was not a party to the 2006 Consent Decree, it claims to have standing to enforce the decree by virtue of the fact that it is the "successor to the prior operator" of the Landfill. (Obj. at 934, n.1.) "The Supreme Court has held, however, that 'a well-settled line of authority . . . establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it.'" *S.E.C. v. Dollar Gen. Corp.*, 378 F. App'x 511, 514 (6th Cir. 2010) (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)); *see Sanders v. Republic Servs. of Ky., LLC*, 113 F. App'x 648, 650 (6th Cir. 2004) ("Following *Blue Chip Stamps*, we have held that third parties, even intended third-party beneficiaries, lack standing to enforce their interpretations of agreed judgments."); *Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992) ("A consent decree is not enforceable . . . by those who are not parties to it.") (quotation marks and citation omitted). Because Landsong was not a party to the underlying federal litigation, or the Consent Decree that grew out of it, it lacks standing to bring the present motion.

#### B. *The Scope and Goals of the 2006 Consent Decree*

By their first three objections, the remaining movants—W. Baumann and Bradley—complain that: (1) the Magistrate Judge misconstrued the "purposes" of the Consent Decree by overlooking the parties' expectations about the future of the Landfill and its subsequent licensing; (2) the R&R urges the premature dissolution of the Consent

8

Decree before its goals have been met; and (3) the R&R ignores the reciprocal nature of the Consent Decree's two objectives. Because these objections require the Court to interpret the scope of the Consent Decree, the Court shall address them together.

The Court begins with the law governing the interpretation of consent decrees. "A consent decree is a strange hybrid in the law." *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994) (quoting *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981)). Consent decrees "bear some of the earmarks of judgments entered after litigation[]" and "[a]t the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519, 106 S. Ct. 3063, 92 L. Ed. 2d 405 (1986) (citations omitted). As the Supreme Court observed:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. *For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.*

*United States v. Armour & Co.*, 402 U.S. 673, 681, 91 S. Ct. 1752, 29 L. Ed. 2d 256 (1971) (first and second emphases in original; third emphasis added).

"The court's task in interpreting a consent decree is 'to ascertain the intent of the parties at the time of settlement.'" *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 477-78 (6th Cir. 2007) (quoting *Huguley v. Gen. Motors Corp.*, 67 F.3d 129, 134 (6th Cir. 1995)). "A court has no occasion to resolve the merits of the disputed issues or the factual underpinnings of the various legal theories advanced by the parties." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983) (citations omitted). Rather, "[a] consent decree . . . should be strictly construed to preserve the bargained for position of the parties." *Id*. (citing, among authorities, *ITT Cont'l Baking Co.*, 420 U.S. 223, 238, 95 S. Ct. 926, 43 L. Ed. 2d 148 (1975)).

Movants broadly interpret the twin aims identified in the 2006 Consent Decree as the licensing of the Landfill's operations and the correction of the regulatory violations existing on the property. (Obj. at 948.) However, examination of the language of the four corners of the Consent Decree reveals that its scope was much more limited. The document "orders that the 2003 construction and demolition debris license" be "reinstated and that the annual renewal licenses for 2004, 2005, and 2006 . . . be deemed issued[.]" (2006 Consent Decree at 282.) Additionally, with respect to the 2006 C&DD license, the Consent Decree designated Edgerton as the Landfill operator and placed certain requirements on Edgerton as the operator. (*Id.* ["The 2006 License is hereby modified to designate Edgerton Holdings LLC as the Operator for the" Landfill.]; *Id*. at 282-83 ["The [2006] License is hereby modified to require that the Operator shall . . . correct existing violations and address other related issues set forth herein" at the Landfill.].) Thus, the parties' negotiated two purposes identified in the Consent Decree

10

are more properly understood as: (1) reinstating and issuing the operating licenses for 2003-2006; and (2) in connection with the 2006 license, installing Edgerton as the operator and requiring it to perform its operator duties, including the remediation of certain enumerated and un-enumerated violations at the site.[4]

There is nothing in the four corners of the 2006 Consent Decree that points to a duty owed by the City of Cleveland to ensure the licensing of the Landfill beyond 2006. While the Court retained jurisdiction to enforce "the terms" of the Consent Decree, there is nothing in the language that would suggest that the Court was to provide on-going oversight of the Landfill in perpetuity. (2006 Consent Decree at 285.) That the Consent Decree required Edgerton to submit a plan for "future operation" of the Landfill does not, as movants suggest, change the result. (Obj. at 941 [citing 2006 Consent Decree at 282].) It was the submission of the plan, and not the execution of the plan, that was governed by the Consent Decree. Moreover, the mere fact that the Consent Decree anticipated that the Landfill would remain a going concern after 2006 does not mean that it was the parties' intent to require the Court to continue to monitor the Landfill's operations indefinitely.

Likewise, the recent actions by the City's zoning administration, taken in connection with Landsong's requests for permits in 2010 and beyond, cannot constitute contempt of the 2006 Consent Decree. There is nothing in the 2006 Consent Decree that precludes Landsong from pursuing a license in 2010 and beyond, but there is also nothing

---

[4] In connection with these duties, Edgerton was also required by the 2006 Consent Decree to comply with state law to provide financial assurances and comply with all applicable laws and regulations governing the operation of such landfills. (2006 Consent Decree at 284-85.)

11

in that document that requires the City to take any particular position regarding future licensing at the site. The movants are free to seek such licensing, but actions surrounding applications for licensing beyond 2006 are simply not governed by the Consent Decree. To conclude otherwise, the Court would have to disregard the plain language of the Consent Decree and overlook the fact that the Consent Decree specifically anticipated that Edgerton would be the operator, and not W. Baumann's unilaterally selected operator—Landsong—who is the present applicant.[5]

Because the Court finds that the Magistrate Judge did not err in his construction of the limited scope of the Consent Decree, movants' first and third objections—that the Magistrate Judge overlooked the parties' expectations for the future of the Landfill and the reciprocal nature of the goals of the Consent Decree—are overruled.

With respect to their second objection—that the R&R's recommended resolution of the present show cause motion would leave the goals of the Consent Decree unfulfilled—movants underscore the public benefits, such as remediation of land erosion near the Landfill, that will be lost if the City is not enjoined from its purported efforts to interfere with current licensing applications. In support, movants cite to *Youngblood v. Dalzell*, wherein the Sixth Circuit instructed trial courts to consider whether the goals of a

---

[5] Movants insist that the Court may consider the 2006 Settlement Agreement as within of the "four corners" of Consent Decree, inasmuch as the Consent Decree specifically incorporates that document by reference. (Obj. at 940 [citing 2006 Consent Decree at 285].) Reference to the 2006 Settlement Agreement does not help movants because it only requires the City to continue to the support the rezoning ordinance that was pending at the time the agreement was finalized, and does not take into account the fact that W. Baumann's newly selected operator would want to pursue surface mining at the site or that the violations at the site would go unabated for years. (2006 Settlement Agreement at 414.)

12

consent decree had been achieved before dissolving existing consent decrees. 925 F.2d 954, 961 (6th Cir. 1991). (Obj. at 946.) Movants' reliance on *Youngblood* and other similar cases is misplaced.

In cases involving institutional reform, such as *Youngblood*, which addressed racial discrimination in the hiring of firefighters, the Sixth Circuit has held that a district court should not terminate its jurisdiction until it determines that the defendants have complied with the terms of the consent decree and achieved the social reform goals set forth therein. *See Heath v. DeCourcy*, 992 F.2d 630, 633 (6th Cir. 1993) (finding that the district court erred in dissolving the consent decree addressing double-celling in prison where the district court failed to determine whether the goal of improving prison conditions had been achieved) (citing *Youngblood*, 925 F.2d at 957-58); *see, e.g. Gonzales v. Galvin*, 151 F.3d 526, 532 (6th Cir. 1998) (consent decree growing out of civil rights litigation was improperly terminated in the absence of findings by the district court that the goal of eradicating race discrimination in hiring practices of a police department had been met).

"However, [the Sixth Circuit has] held that consent decrees relating to institutions are 'fundamentally different' from those between private parties." *Sweeton v. Brown*, 944 F.2d 905 (Table), 1991 WL 181751, at *9 (6th Cir. Sept. 17, 1991) (quoting *Heath*, 888 F.2d at 1109). "This is because these types of decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to sound and efficient operation of its institutions.'" *Id*. (quoting *Heath*, 888 F.2d at 1109). Because of the broad impact of consent decrees that grow out of institutional reform litigation, the standard for

13

extending such decrees by way of modification is more relaxed. *Id*.; *see Thompson v. United States Dep't of Housing & Urban Dev.*, 404 F.3d 821, 826 (4th Cir. 2005) (noting the "need for a flexible approach [in modifying consent decrees] was particularly great as to consent decrees arising out of institutional reform litigation[.]") (citing *Rufo v. Inmates of Suffolk Cnty.*, 502 U.S. 367, 379, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992)); *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1149 (6th Cir. 1992) (recognizing a "less stringent" modification standard in institutional consent decrees) (citations omitted).

The present Consent Decree did not spring from institutional reform litigation. Instead, it was the result of the resolution of a dispute between parties involving the use of a parcel of land. As such, it was not crafted to ensure the long-term eradication of a societal ill, but represented the parties' negotiated compromise regarding the operation of a Landfill on the property between 2003 and 2006. *See Armour*, 402 U.S. at 681. Neither the fact that one of the parties to the lawsuit happened to be a public entity, nor the fact that the public would have indirectly benefited from certain environmental improvements to this private property, changes the nature of the underlying litigation.

To require the City to issue a license in 2015 to Landsong would certainly "satisfy the purposes" of movants and Landsong in operating the Landfill in 2015 and beyond and in enabling them to engage in surface mining at the site. It would also, however, result in a ruling that reaches far beyond the scope of the Consent Decree and the parties' expectations at the time it was entered. *See Armour*, 402 U.S. at 681. Again, the Consent Decree cannot be construed to mandate that the City must issue licenses in

perpetuity to whomever movants unilaterally select, at any given time, to operate the Landfill, any more than it can be interpreted to require the City to endorse surface mining at the site, something that was not contemplated by the parties when the Consent Decree was entered. Moreover, the fact that movants, through Landsong, now purportedly stand ready to remediate the violations enumerated more than eight years earlier in the Consent Decree does not provide justification for re-writing the parties' bargained for compromise. *See Vanguards*, 23 F.3d at 1018 ("[A] consent decree should be construed to preserve the position for which the parties bargained.") (citing *Vogel*, 959 F.2d at 598) (further citation omitted). Movants' second objection is overruled.

### C. *No Inequitable Enforcement of the 2006 Consent Decree*

By their fourth objection, movants complain that the denial of their show cause motion would result in an inequitable enforcement of the Consent Decree. Movants direct the Court's attention to the November 16, 2006 Order of Contempt finding movants and others in violation of the 2006 Consent Decree, highlighting language prohibiting movants "*from engaging in any further conduct violating the Consent Decree or impeding [the operator] from operating the Landfill . . . .*" (Obj. at 950 [quoting Nov. 16, 2006 Order of Contempt, emphasis and substituted language supplied by movants].) Movants underscore the fact that the injunction was not limited to either a certain time period or to any particular type of impeding. (Obj. at 951.) Movants' attempt to isolate

15

(and re-write) one sentence from the Court's prior order is unavailing.[6]

In 2006, the Court found movants had violated the terms of the Consent Decree by interfering with the ability of *Edgerton* to operate and take "other actions necessary to correct existing violations . . . as required by the Consent Decree." (Nov. 16, 2006 Order of Contempt.) The corrections at issue were tied to the 2006 license and were clearly covered by the 2006 Consent Decree. The Court's prior contempt order, therefore, was well within the scope of the Consent Decree. As set forth above, the present motion strays far beyond the scope, and its denial does not result in inequitable treatment. The fourth objection is overruled.

### D.  *Changed Circumstances Cannot Support Contempt Motion*

In their final objection, movants maintain that the R&R discounts evidence of changed circumstances, including the state court litigation between movants and Edgerton and Landsong's efforts to seek regulatory authority to operate the Landfill. (Obj. at 953.) Movants now argue, for the first time, that these changed circumstances necessitate a modification of the 2006 Consent Decree. (*Id*. at 954.)

"Our Circuit holds that '[t]he Magistrate Judge Act, 28 U.S.C. § 631 *et seq*. . . . does not allow parties to raise at the district court stage new arguments or issues.'" *Jones-Bey v. Caruso*, No. 1:07-cv-392, 2009 WL 3644801, at *1 (W.D. Mich.

---

[6] The actual relevant language of the contempt order was directly tied to the terms (and the relevant time period) of the Consent Decree, and provides that the contemnors were "enjoined from engaging in any further conduct violating, obstructing, impeding and/or interfering with implementation of the Consent Decree by denying access to the Property or otherwise impeding the ability of Edgerton Holdings to operate the Bradley Road landfill and/or to implement the Consent Decree under the City's supervision." (Nov. 16, 2006 Order of Contempt at 354.)

Oct. 30, 2009) (quoting *Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000) (further citation omitted); *see United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998) ("issues raised for the first time in objections to [a] . . . report and recommendation are deemed waived") (citation omitted); *Marr v. Foy*, No. 1:07-cv-908, 2010 WL 3061297, at *4 (W.D. Mich. Aug. 3, 2010) ("It is well established that a party may not raise an argument, advance a theory, or marshal evidence before a District Judge that was not fairly presented to the Magistrate Judge.") "The Magistrates Act was not intended 'to give litigants an opportunity to run one version of their case past the magistrate, then another past the district court.'" *Jones-Bey*, 2009 WL 3644801, at *1 (quoting *Greenhow v. United States*, 863 F.2d 633, 638-39 (9th Cir. 1988), *rev'd o.g. sub nom*, *United States v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992) (en banc)).

"Moreover, '[i]f the Court were to consider [this] untimely argument[], it would unduly undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Recommended Ruling has issued to advance additional arguments.'" *Kita v. Comm'r of Soc. Sec.*, No. 1:08-cv-446, 2009 WL 1464252, at *2 (W.D. Mich. May 18, 2009) (quoting *Burden v. Astrue*, 588 F. Supp. 2d 269, 279 (D. Conn. 2008)); *see, e.g., In re Neurontin Mktg., Sales Practices, and Prods. Liab. Lit.*, 433 F. Supp. 2d 172, 185 (D. Mass. 2006) ("Defendants raised none of these arguments before the Magistrate Judge, and they may not raise them for the first time as objections to the Report and Recommendation.") (citation omitted); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987) ("[H]ere the district court judge properly refused to consider an argument which could have been, but inexplicably was not,

presented to the magistrate in the first instance.") Because movants did not raise the issue of modification before the Magistrate Judge, the objection is overruled.

Of course, when the objection is considered in the context of the present motion—a motion to show cause why defendants should not be held in contempt of the Consent Decree—the weakness of movants' position is thrown into sharp relief. By now advocating for a modification of the Consent Decree, movants essentially concede that they cannot point to "a definite and specific order of the court" requiring defendants to "perform or refrain from performing a particular act or acts[.]" *See Cincinnati Bronze, Inc.*, 829 F.2d at 590. In the absence of "clear and convincing evidence" that defendants have violated a specific provision of the 2006 Consent Decree, it would be inappropriate for the Court to modify the consent decree to retroactively manufacture a violation. *See id*. For this additional reason, the objection is overruled.[7]

In so ruling, the Court is mindful that district courts retain the jurisdiction to, in appropriate circumstances, modify consent decrees. *See Thompson*, 404 F.3d at 825-26 (discussing the court's "inherent power" to modify consent decrees); *Waste Mgmt. of Ohio*, 132 F.3d at 1146 (recognizing that courts have a "duty to enforce, interpret, modify, and terminate their consent decrees as required by circumstance"). Nonetheless, even if the request for modification was properly before this Court, there remains a serious question as to whether it would have been approved. Rule 60(b)(5)

---

[7] It is appropriate for the Court to reach this conclusion without holding a hearing. While a hearing is necessary before a consent decree can be modified over the objection of one party, a hearing is not necessary before a modification is rejected when (as here) the "motion does not raise a serious challenge to the consent decree and merely appears to be a post-judgment attempt by a party to escape from obligations it had voluntarily assumed[.]" *See United States v. Wayne Cnty., Mich.*, 369 F.3d 508, 512 (6th Cir. 2004) (quotation marks and citation omitted).

18

permits modification of a consent decree when continued prospective application would be inequitable. Fed. R. Civ. P. 60(b)(5). "This rule does not allow modification simply 'when it is no longer *convenient* to live with the terms of a consent decree,' but solely when there is 'a significant change either in factual conditions or in law.'" *Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 613-14 (6th Cir. 2011) (quoting *Rufo*, 502 U.S. at 383-84) (emphasis in original). Moreover, "modification of a consent decree is an extraordinary remedy that should not be undertaken lightly." *Id*. at 614 (quotation marks and citation omitted).

There is nothing in the record to show that movants have met their "heavy burden" of demonstrating that they "made a reasonable effort to comply with the decree and should be relieved of the undertaking under Rule 60(b)." *Northridge Church*, 647 F.3d at 616 (quoting *Rufo*, 502 U.S. at 385). Rather, the record demonstrates that movants opposed Edgerton's efforts to comply with the Consent Decree, and their actions resulted in a finding of contempt and years of state court litigation. Considerable time and effort also seem to have been devoted to pursuing surface mining at the Landfill, an activity not contemplated by the Consent Decree. Under these circumstances, movants would be hard pressed to demonstrate that they made reasonable efforts to comply with the Consent Decree as written. *Id*. at 618 (In affirming district court's denial of a motion to modify a consent decree, court relied, in part, on the fact that the changed circumstances were not beyond the movant's control).

### IV. CONCLUSION

For all of the foregoing reasons, the Court overrules the movants' objections and accepts the findings of the Magistrate Judge, including the ultimate recommendation that the motion to show cause be denied. Movants' motion to show cause (Doc. No. 88) is denied.

**IT IS SO ORDERED**.

Dated: March 3, 2015

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**